## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| In re: | CASE NO. 25-20705-JRS |
| BMX TRANSPORT, LLC, | CHAPTER 11 |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTOR TO ENTER INTO POSTPETITION FACTORING
AGREEMENTS IN SUBSTANTIALLY THE FORM ATTACHED AS EXHIBIT B
HERETO SUPPLANTING THEIR EXISTING PREPETITION FACTORING
AGREEMENT TO SELL ACCOUNTS RECEIVABLE POST-PETITION AND TO
INCUR CREDIT, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO
SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE, (III) MODIFYING THE
AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING PURSUANT TO
BANKRUPTCY RULE 4001(C)(2), AND (V) GRANTING RELATED RELIEF**

BMX Transport, LLC (the "**Debtor**" or "**BMX**") files this motion (this "**Motion**") for entry of an interim order substantially in the form attached hereto as Exhibit C (the "**Interim Order**"), and a final order substantially in the form attached hereto as Exhibit D (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**", and each, a "**DIP Order**") (a) authorizing the Debtor to enter into a postpetition factoring agreement supplanting its existing prepetition factoring agreement in order to sell accounts post-petition and to incur credit, (b) granting RTS (defined below) adequate protection pursuant to sections 361, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), (c) modifying the automatic stay, (d) scheduling a hearing (the "**Final Hearing**") pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to consider entry of the Final Order, authorizing and approving the DIP Factoring Agreement (defined below) on a final basis, and (e) granting related relief, respectfully showing the Court as follows:

## BACKGROUND

1.      The Debtor operates a transportation business, specializing in freight and specialty transportation services. With a comprehensive network and extensive industry experience, the business offers tailored solutions, including truckload services using vans and reefers, warehousing supported by advanced inventory systems, and secure 24-hour facilities. BMX excels in handling complex logistics, ensuring efficiency and transparency in meeting client shipping goals across the nation.

2.      The Debtor has been significantly impacted by economic challenges within the transportation industry. The persistently high fuel prices have increased operating costs, placing considerable financial strain on the business. Simultaneously, the industry has experienced a prolonged period of exceptionally low per-mile transportation rates, further compressing profit margins.

3.      These dual pressures—a volatile fuel market and declining rate structures—have created an unsustainable financial environment, making it increasingly difficult for the corporation to cover operational expenses while remaining competitive in the marketplace. This challenging economic climate has directly contributed to the company's current financial difficulties, necessitating this proceeding to protect and preserve its remaining assets for the benefit of creditors.

4.      Despite the Debtor's efforts, the mounting monthly debt started consuming its resources and depleting its cash reserves. Faced with these insurmountable challenges, the Debtor finds itself filing for Chapter 11 to restructure and stabilize its operations.

5.      On May 20, 2025 (the "**Petition Date**") the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued

in possession of its properties and has operated and managed its affairs as a debtor-in-possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

6.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtor consents to the entry of final orders and judgments by the Bankruptcy Court.

7.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6003 and 9014.

**RTS Financial Service Prepetition Factoring Agreement and Related Obligations.**

8.    The Debtor entered into that certain prepetition Factoring Agreement dated April 12, 2021 (the "**Prepetition Factoring Agreement**") by and between the Debtor and RTS Financial Service, Inc. a Kansas corporation ("**RTS**"), under which the Debtor agreed to present to RTS for purchase, and RTS was given an option to purchase, accounts receivable on the terms and conditions of the Prepetition Factoring Agreement. A true and correct copy of the Prepetition Factoring Agreement is attached hereto as **Exhibit A**.

9.    The Debtor and RTS have been operating under the Prepetition Factoring Agreement up to and including the Petition Date.  In such capacity, RTS (the "**Prepetition Secured Lender**") has been granted a first-priority security interest in and lien on all of the Debtor's accounts and accounts receivable, wherever located or situated and whether now existing or arising in the future, and whether now owned or at any time in the future acquired, together with all proceeds and monies due or becoming due on such accounts; all guaranties, insurance, and security for such accounts; all security reserves related to such accounts; all rights and interests in the goods giving rise to such accounts, including any and all related insurance; all chattel papers, instruments, general intangibles, securities and contract rights including those associated with the

accounts or purchase order contracts, all equipment, inventory, and deposit accounts; and all proceeds of any of the foregoing accounts, rights and interests (collectively, the "**Prepetition Collateral**"), on account of the obligations set forth in the Prepetition Factoring Agreement.

## Need for Postpetition Financing

10.     In connection with the above-captioned chapter 11 case (the "**Chapter 11 Case**"), the Debtor and RTS have agreed to enter into a new postpetition Factoring Agreement (the "**DIP Factoring Agreement**") supplanting the existing Prepetition Factoring Agreement and desire to operate on a postpetition basis in accordance with its terms (the "**DIP Facility**"). A true and correct copy of the proposed DIP Factoring Agreement, including all attachments, is attached hereto as **Exhibit B** and incorporated herein for all purposes.

11.     Without the ability to factor its accounts receivable pursuant to the DIP Factoring Agreement, the Debtor's operations would be in severe jeopardy and likely come to a complete standstill, as its would experience crippling cash flow issues while waiting for delayed payments. The operational costs of maintaining a fleet of dozens of trucks and trailers are substantial, including payments to drivers, taxes, insurance, and routine expenses like fueling, repairs, and maintenance. Fuel costs alone represent a significant and volatile expense, with fluctuating prices heavily impacting the Debtor's cash flow. Maintenance and repairs are also essential for keeping trucks compliant with the Department of Transportation, ensuring safety and minimizing downtime, yet these costs can be unpredictable and often result in substantial outlays. Insurance premiums, which are high due to industry risks, must be consistently met, along with compliance-related expenses such as state and federal taxes, tolls, and permits.

12.     Factoring has been the only practical solution to ensure the Debtor maintains sufficient liquidity to cover these operating expenses. Historically, the Debtor has relied heavily on factoring a substantial portion of its accounts receivable pursuant to the Prepetition Factoring

Agreement, allowing it to meet these significant financial obligations on time and continue smooth operations without cash flow interruptions. Approval of the DIP Factoring Agreement and the other relief sought herein is necessary in order to permit, among other things, the orderly continuation of the Debtor's business. In short, without the Debtor's entry into the DIP Factoring Agreement, the Debtor cannot survive.

### Alternative Sources of Funding Are Not Readily Available.

13.     The Debtor could not access unsecured credit under section 503(b)(1) of the Bankruptcy Code. Additionally, except as set forth herein, the Debtor was also unable to obtain secured credit under sections 364(c)(1), 364(c)(2), and 364(d)(1) of the Bankruptcy Code without granting the RTS the DIP Liens (defined herein) and the DIP Superpriority Claims (defined herein) under the terms and conditions set forth in the DIP Factoring Agreement.

14.     After good faith, arm's-length negotiations with respect to the terms and conditions of the DIP Factoring Agreement, the Debtor concluded, in an exercise of its sound business judgment, that the financing to be provided by RTS pursuant to the terms of the DIP Factoring Agreement and Interim Order represents the most favorable terms and adequate source of financing available to the Debtor. The Debtor believes the DIP Factoring Agreement is far superior to any financing available and is in the best interests of the Debtor and all of its stakeholders.

15.     As outlined below, in accordance with the DIP Factoring Agreement, the Debtor shall submit to RTS all of their accounts receivable arising from its business. RTS may purchase all of the Debtor's rights, title, and interest in and to such accounts (the "**Purchased Accounts**") as RTS determines in its sole discretion for the purchase price and factoring charges as set forth in Section 3 of the DIP Factoring Agreement. The DIP Factoring Agreement (a) is secured by DIP Liens that are first priority and senior to all other liens, subject to any Carve-Out (defined herein), (b) provides for Adequate Protection Liens (as defined herein), and (c) contains covenants,

milestones, and conditions that are reasonably attainable by the Debtor and customary for transactions of this type, including that the Purchased Accounts are not subject to any lien, encumbrance, security interest or other claim, other than the Adequate Protection Liens and DIP Liens.

<u>**BASIS FOR RELIEF**</u>

**Entry Into the DIP Factoring Agreement Is an
<u>Exercise of the Debtor's Sound Business Judgment.</u>**

16.      Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. Courts grant Debtor considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc*., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry*., 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co*., 47 B.R. 444, 449 (Bankr. D. Colo. 1985)

("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

17.     In evaluating the proposed terms of postpetition financing and determining whether it is within the debtor's sound business judgment, courts generally perform a qualitative analysis to review the underlying economics of the transaction, considering factors such as whether:

a.   unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.   the credit transactions are necessary to preserve assets of the estate;

c.   the terms of the credit agreement are fair, reasonable, and adequate;

d.   the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the Debtor's estate and its creditors; and

e.   the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364 of the Bankruptcy Code). Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

18.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (*quoting Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (internal alterations and quotations omitted)); *In re Pittsburgh Sports Assocs. Holdings Co.*, 239 B.R. 75, 87 (Bankr. W.D. Pa. 1999). Courts require only that the Debtor "show that a sound business purpose justifies such actions." I*n re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phx. Steel Corp*., 82 B.R. 334, 335– 36 (Bankr. D. Del. 1987).

19.     Furthermore, in determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Factoring Agreement, the Bankruptcy Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc*., the Bankruptcy Court for the Southern District of New York held that "[a]lthough all parties . . . are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.

20.     Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the

likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict. No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

21.    This rationale applies with full force here. The proposed DIP Facility is a testament to the Debtor's dedication to achieving a successful and orderly reorganization, and the agreements between the Debtor the DIP Lender will ultimately benefit all parties in interest due to the excellence of the outcome and the reduction of administrative expense costs.

### The Debtor Should Be Authorized to Grant Liens and Superpriority Claims.

22.    The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth in this Motion and the DIP Orders pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the Debtor proposes to provide to the DIP Lender valid, binding, enforceable, non-avoidable, and automatically and properly perfected first-position postpetition security interests in and liens on the DIP collateral, including all Accounts and unencumbered assets of the Debtor.

23.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy

-9-

Code, (*i.e.*, by allowing a lender only an administrative claim); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.*), 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp*., 71 B.R. at 549.

24.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*.; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and/or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) of the Bankruptcy Code where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

25.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the

Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or [section] 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtor is unable to obtain unsecured credit. Therefore, approving superpriority claims and first-priority liens in favor of the DIP Lender is reasonable and appropriate.

26.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

27.    Accordingly, the Debtor may incur "priming" liens under the DIP Facility if either (a) each party with a security interest in the Debtor's Accounts have consented and/or (b) such party's interests in its collateral are adequately protected. One or more other entities may claim that they are either secured or have a security interest in the Debtor's Accounts and/or Cash Collateral, and the Debtor is in the process of reviewing those claims and liens. The Debtor shall provide notice of this Motion and notice of any hearing on this Motion to any creditor which may even speculatively have an interest in the Debtor's Accounts and/or Cash Collateral.

-11-

28.     Notwithstanding the foregoing, RTS, as the party with the senior and first-priority interest in all of its Prepetition Collateral, has affirmatively consented to the DIP Facility and is actively participating in the proposed DIP Facility. Moreover, as set forth more fully in the Interim Order, the Debtor proposes to provide a variety of adequate protection to protect the interests of RTS. Therefore, the relief requested pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code is appropriate.

**The DIP Lender Should Be Deemed a Good Faith Lender
Under Section 364(e) of the Bankruptcy Code.**

29.     The terms and conditions of the DIP Facility, including the terms of the DIP Factoring Agreement, are fair and reasonable and were negotiated in good faith at arms' length.

30.     Accordingly, the obligations incurred in connection with the DIP Facility should be afforded the benefits of section 364(e) of the Bankruptcy Code.

31.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section 364 of the Bankruptcy Code to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m). 7 Collier on Bankruptcy, 16th ed. ¶ 364.08, p. 37 ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction."). To analogize to the sale context, "the

misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM)] 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992) (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *accord In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010). 61.

32.     As explained in detail herein, the DIP Factoring Agreement is the result of: (a) the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain necessary postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtor and the DIP Lender. *Gen. Growth Props.*, 423 B.R. at 722 (finding good faith based on testimony that the terms of the debtor- in-possession financing were "vigorously negotiated at arm's length and in good faith.").

33.     The Debtor submits that the terms and conditions of the DIP Factoring Agreement are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Factoring Agreement other than as described herein. Accordingly, the Bankruptcy Court should find that the RTS is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

### Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

34.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Bankruptcy Court may conduct a

preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

35.     The Debtor is in the transportation and distribution business, and without steady access to working capital they will be unable to meet their payroll obligations, fuel purchases, fund continuing operations, or otherwise sustain their operations. Accordingly, the Debtor requests that the Bankruptcy Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility. This relief will enable the Debtor to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Modification of the Automatic Stay Is Warranted.

36.     The DIP Factoring Agreement and the proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit RTS to enforce its rights under the DIP Factoring Agreement and the proposed Interim Order. Most importantly, the Debtor seeks vacation or modification of the automatic stay to the extent needed to allow for the creation and perfection of the DIP Liens. Stay modification provisions are ordinary features of debtor in possession financing facilities and, in the Debtor's business judgment, this modification is reasonable under the circumstances.

### Request for a Final Hearing.

37.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests that the Bankruptcy Court set a date which is no later than 35 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this motion. The Debtor also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail

-14-

and further request that the Bankruptcy Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

38.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtor believes an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtor's operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of this Chapter 11 Case would severely disrupt the Debtor's operations at this critical juncture and imperil the Debtor's restructuring. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Reservation of Rights

39.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtor, (b) a waiver of the Debtor's rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtor's rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtor expressly reserve its rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Bankruptcy Court grants

-15-

the relief sought herein, any payment made pursuant to the Bankruptcy Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's rights to subsequently dispute such claim.

CONCLUSION

WHEREFORE, for the reasons set forth above, the Debtor respectfully requests that the Bankruptcy Court (a) enter the Interim Order granting the relief requested herein on an interim basis, (b) schedule the Final Hearing pursuant to Bankruptcy Rule 4001(c)(2) to consider entry of the Final Order, authorizing and approving the DIP Facility on a final basis, and (c) grant such other and further relief as the Bankruptcy Court deems appropriate.

Dated: May 22, 2025                    Respectfully submitted,

KECK LEGAL, LLC

*/s/ Benjamin R. Keck*
Benjamin R. Keck, Ga. Bar No. 943504
Jonathan Clements, Ga. Bar No. 130051
2801 Buford Highway NE, Suite 115
Atlanta, GA 30329
Tel. (470) 826-6020
bkeck@kecklegal.com
jclements@kecklegal.com
*Proposed Counsel for the Debtor*

## Exhibit A

**Prepetition Agreement**

# FACTORING AGREEMENT

THIS FACTORING AGREEMENT (the "Agreement") made and entered into this **APRIL 12, 2021** (the "Effective Date") by and between **RTS FINANCIAL SERVICE, INC.,** ("Factor"), a Kansas Corporation; and **BMX TRANSPORT L.L.C.** ("Assignor"), a **Limited Liability Company** in the state of **Georgia**.

## RECITALS

1.   Assignor desires to sell to Factor all of its existing and future Accounts Receivable ("Accounts") arising from services performed in the regular course of Assignor's business; and

2.   Factor desires to purchase certain of those Accounts, which Factor in its sole discretion deems acceptable for purchase, according to the terms and conditions provided in this Agreement.

In consideration of the above recitals and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**SECTION 1.  DEFINITIONS**

An "Account" means any right to payment for services rendered by or on behalf of Assignor.  "Account Debtor" means a person or other entity, which is obligated to pay the Account.

**SECTION 2.  PURCHASE OF ACCOUNTS**

2.1   Assignor agrees to present to Factor for purchase, with recourse, all Accounts arising from the activities and services performed by Assignor.

2.2 Factor, in its sole discretion, may purchase such Accounts from Assignor as Factor determines to be acceptable.  Assignor hereby agrees to sell, assign, transfer, convey and deliver to Factor, such Accounts as Factor shall elect to purchase.  Assignor will notify each Account Debtor of the sale of its Account or Accounts to Factor and shall place a clear statement or legend, approved by Factor, on each such Account invoice, purchase order, or statement, stating that such Account has been sold and assigned, and is payable to Factor at its office at 9300 Metcalf Ave., Overland Park, Kansas 66212 or at such other address as Factor shall designate in writing.  Factor shall become the absolute owner of all Accounts purchased hereunder.  All remittances received by Assignor for payment of Accounts sold to Factor are the property of Factor, and Assignor shall hold such proceeds in trust for Factor, and shall immediately deliver to Factor, in the identical form, all payments received by Assignor on each such Account, together with all documents accompanying the remittance to Assignor.  Assignor guarantees the timely payment of the monies and amounts represented by the assigned Accounts.  Factor will not purchase Accounts representing services for which assignor did not in fact act as a Transportation Carrier.

**SECTION 3.  PURCHASE PRICE AND FACTORING CHARGE; SECURITY RESERVES**

3.1 The purchase price for each Account purchased by Factor hereunder shall be the net amount of such Account, less the Factor's fee, which fee shall be an amount equal to **NINE TENTHS PERCENT (.9%)** of such net amount.  "Net amount" means the gross amount of the Account less any discount or allowance of any nature allowed to the Account Debtor. Throughout the term of this Agreement, Factor will review the US Prime Rate ("Prime") in effect as of the first business day of each calendar month and, in the event that the then current Prime changes, the parties hereby agree to a commensurate charge equal to the difference between the effective Prime in effect at the beginning of the month and a base Prime rate of 3.25%.  Notwithstanding anything contained herein and to the contrary, Prime will always be the greater of the base Prime rate of 3.25% or the effective Prime at the beginning of the month, whichever is higher.

3.2 Payment of the purchase price to Assignor shall be made as follows:

(a) Upon the presentation by Assignor to Factor of documents reasonably acceptable to Factor, for an Account approved for purchase by Factor, and provided no claim or dispute shall then exist with the Account Debtor as to the Account, Factor will advance to the Assignor the purchase price of the Account, less a security reserve equal to **ONE AND ONE TENTH PERCENT (1.1%)** of the net amount of the Account.

(b) Upon Factor's receipt of full payment of the invoice for the Account from the Account Debtor, and provided Assignor shall not otherwise be in default in any respect under this Agreement, Factor will remit to the Assignor the security reserve in complete and full payment of the purchase price.  In all cases, Factor will also retain its Factor's fee.

## SECTION 4.  SECURITY INTEREST

4.1 Assignor hereby grants to Factor as collateral, to secure all of the debts, liabilities and obligations of Assignor to Factor under this Agreement, including all costs and expenses incurred by Factor in connection with the enforcement of its rights under this Agreement, a security interest in the following property of Assignor: all assets, including, but not limited to, (a) all real and personal property, (b) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Assignor, together with all proceeds and monies due or becoming due on such Accounts; all guaranties, insurance and security for such Accounts; all security reserves related to such Accounts; all of Assignor's rights and interests in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefore as replacements and all additions thereto; (c) all of Assignor's chattel paper, instruments, general intangibles, securities, contract rights and insurance  associated with or related to the Accounts;  (d) all  equipment, inventory, and deposit accounts; and (e) all proceeds of any of the foregoing Accounts, property,  rights and interests.  Factor in its own name, or Factor's collateral agent Restored 121 Trust in its name as the agent of Factor, may file financing statements and all amendments thereto describing as the collateral any or all of the foregoing collateral by any description Factor or its collateral agent deems appropriate in any jurisdiction or office Factor or its collateral agent deems appropriate to perfect Factor's security interest in foregoing collateral.

4.2 In the event of Assignor's breach of any warranty made in this Agreement or the Assignor's failure to observe or perform any of the provisions or obligations of this Agreement, Assignor shall be in default, and Factor may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the UCC as adopted and in force in the State of Kansas.  In addition, upon default by Assignor, Factor shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors, including, but not limited to, (i) in Assignor's name, or otherwise, demand, make claim for, sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts, (ii) notify Account Debtors of Factor's security interest, regardless if Assignor has sold an Account to Factor related to such Account Debtor and otherwise notify and instruct Account Debtors, in Assignor's name, of the address, and procedures for making payments to Factor, and (iii) take all reasonable steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement.  Factor's exercise of the foregoing rights shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing rights.  Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

## SECTION 5.  REPURCHASE OF ACCOUNTS

All Accounts purchased by Factor from Assignor are purchased with full recourse.  If Assignor breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if any Account purchased by Factor hereunder is not paid in full on or before the payment due date of such Account, then upon request by Factor, Assignor shall immediately repurchase such Account from Factor for an amount equal to the face amount of such Account (less any payments received by Factor on such Account from the Account Debtor), together with interest thereon at the rate of **ZERO%** per annum from the date of the assignment of such Account to Factor.  Any security reserve held by Factor for such Account shall be released only in accordance with Section 3.2(b), and Factor shall in all events also be entitled to and shall retain its Factor's fee on the Account.  Typically, Factor will require repurchase of any unpaid Account no later than **90** days after the Account invoice date, unless Factor, in its sole discretion chooses otherwise.  However, in all cases, any unpaid Account must be repurchased by Assignor within **120** days after the Account invoice date.  Assignor shall not be relieved of its absolute repurchase obligation hereunder, even though the Account Debtor, whose Account Assignor must repurchase hereunder, was listed on Factor's debtor credit rating list.

## SECTION 6.  REPRESENTATIONS AND WARRANTIES

Assignor represents, covenants, warrants and agrees as follows:

6.1 If Assignor is a corporation, that it is a corporation duly organized, existing and in good standing under the laws of the state of **Georgia**; that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action; and that this Agreement, when duly executed and delivered by the Assignor and the Factor, will constitute a legal, valid and binding agreement of the Assignor fully enforceable in accordance with its terms and conditions.

DocuSign Envelope ID: F5073717-25B7-4632-9B4E-28AA367411FDD

6.2  The Assignor's address set out in Section 14 of this Agreement is the address of Assignor's principal office and its sole place of business.  Assignor shall give Factor immediate written notice of any change in the location of its principal office, the addition of any new place or places of business and their addresses, any name change or the addition of any name under which Assignor does business, or any change in the nature or status of Assignor's business or operations.

6.3  As to each Account purchased by Factor under this Agreement:  (1) the Account is not yet past due, arose in the ordinary course of Assignor's business and represents a bona fide completed transaction; (2) the title of Assignor to the Account is absolute and subject to no assignment, claim, lien or security interest; (3) the Account, as shown on Assignor's books and records and on any invoices, bills of lading or statements, delivered to Factor is a legally enforceable debt owed by Account Debtor to Assignor in its full face amount; (4) no partial payment has been made by anyone on such Account; (5) the Account is not subject to any claims, either currently existing, or future claims that Factor can reasonably determine are forthcoming due to the filing of a bankruptcy or related action by any account debtor that may cause Factor to pay funds or return funds already received due to a preference action, fraudulent transfer, or otherwise; (6) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account; or (7) the Account is payable not more than thirty (30) days from the date of assignment of the Account to Factor.

6.4  Assignor shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Factor deems necessary to protect its interest under this Agreement.

6.5  Assignor shall indemnify, defend and hold Factor harmless from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Assignor, and from any losses, expenses, attorneys fees or other costs incurred by Factor caused by or arising out of any such defaults or breaches of this Agreement by the Assignor and from any costs expenses or attorneys fees incurred by Factor in enforcing Factor's rights under this Agreement; from any dispute or claim resulting in liability, loss, expense, cost or attorneys fees caused by or arising out of the rejection of any work performed or services rendered by Assignor; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor.

6.6  The Assignor shall not, without the express written consent of the Factor, release, compromise, settle or adjust any Account purchased hereunder, or grant any discounts, allowances or credits thereon.

## SECTION 7.  POWER OF ATTORNEY

7.1  In order to carry out this Agreement, and to avoid unnecessary notification of Account Debtors, Assignor irrevocably appoints Factor as Assignor's true and lawful attorney with the full power and right to: (a) invoice or bill for, collect, receive, and deposit to Assignor's bank accounts any and all amounts which may be due or become due to Assignor from Account Debtors, and to use Assignor's name for purposes of billing and collection of any and all amounts due; (b) receive, accept, open, dispose of and redirect any and all mail addressed to Assignor;  (c) negotiate any checks received in payment of Accounts whether payable to Assignor or Factor or both, and endorse the name of Assignor on any checks or other evidences of payment or other instruments or documents that may come into the  possession of Factor on Accounts purchased by Factor and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Assignor to Factor; (d) in Assignor's name, or otherwise, demand, make claim for. sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts; (e) execute and deliver receipts or acknowledgments to Account Debtors for such amounts due which shall be binding upon Assignor and Factor; (f) notify Account Debtors of the sale of Accounts to Factor and notify and instruct Account Debtors, in Assignor's name, of the address and procedures for making payments on any Accounts that are sold to Factor or which constitute collateral hereby granted by Assignor to Factor; (g) take all steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement;  (h) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 4 hereof by any description Factor deems appropriate in any jurisdiction or office Factor deems appropriate to perfect its security interest in the collateral described in Section 4 hereof; and (i) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Assignor wherever located in order to satisfy any obligations of Assignor to Factor under this Agreement.  It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Assignor to Factor under this Agreement have been satisfied.

7.2 Exercise of the foregoing powers shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing powers.  Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

7.3  The Factor shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any

instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account.

## SECTION 8. BOOKS, RECORDS AND FINANCIAL STATEMENTS

All of Assignor's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Assignor's Accounts and business shall be accurately and properly prepared and maintained by Assignor and shall disclose the sale of Accounts purchased by Factor. All such books, ledgers, accounts, records, correspondence and papers shall be opened by Assignor at all reasonable times for Factor's inspection, audit and copying. Upon request, but not more often than quarter annually, Assignor shall furnish Factor with financial statements including income statements and balance sheets showing Assignor's financial condition. Upon request, Assignor shall also provide Factor with annual financial statements acceptable to Factor.

## SECTION 9. ATTORNEY'S FEES AND EXPENSES

If Factor retains the services of an attorney to enforce any obligation of Assignor to Factor under this Agreement, Factor shall be entitled to recover from Assignor all attorneys fees, court costs and expenses, regardless of whether or not an action is commenced.

## SECTION 10. GOVERNING LAW AND CONSENT TO JURISDICTION

10.1 This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.

10.2 Factor and Assignor agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in a State or Federal Court in or for Johnson County, Kansas. Factor and Assignor submit to the jurisdiction of the State and Federal Courts for Johnson County, Kansas for the purpose of deciding any questions, disputes or causes, arising under this Agreement, and in the event Assignor is not qualified to do business in the State of Kansas, the Secretary of State of the State of Kansas is hereby designated as Assignor's agent for service of process for any actions commenced under or to enforce this Agreement in the State of Kansas, provided that a copy of any such process shall be mailed to Assignor in accordance with the notice provisions of this Agreement.

## SECTION 11. TERMINATION

11.1 This Agreement shall have an initial term of twelve (12) months from the Effective Date hereof (the "Original Term"), and shall automatically renew for successive periods of twelve (12) months ("Renewal Periods"), unless sooner terminated as hereinafter provided. Assignor may terminate this Agreement as of the expiration of the Original Term or any Renewal Term by giving Factor prior written notice of its intention to so terminate; provided, however, that any presentation of Accounts by Assignor to Factor for funding after the termination date shall cancel any prior termination notice and renew this Agreement for another Renewal Period. Such notice shall be given by Assignor to Factor at least sixty (60) days, but not more than ninety (90) days, prior to the expiration of the Original Term or any Renewal Term. Factor may terminate this Agreement at any time upon thirty (30) days prior written notice to Assignor; provided however, that this Agreement shall terminate immediately, at the option of Factor, upon the insolvency of the Assignor or the filing of a petition in bankruptcy by or against the Assignor or upon any default or breach of this Agreement by Assignor. Assignor hereby acknowledges and agrees that Factor will incur significant time and expense setting up this financing relationship (the "Due Diligence Expenses"). In the event that Factor does not purchase any Accounts from Assignor under this Agreement for any reason out of the control of Factor (including, but not limited to, the inability of Assignor to completely terminate its relationship with another financing company), Assignor hereby agrees to pay Factor a fee equal to $5,000.00 to cover the Due Diligence Expenses.

11.2 All of the Assignor's covenants, warranties and agreements under this Agreement made to Factor, and all rights and remedies of the Factor under this Agreement, shall survive the termination of this Agreement and shall continue in full force and effect until all Accounts purchased hereunder are paid in full and all debts and obligations to of Assignor to Factor hereunder have been satisfied in full. Upon termination Assignor shall remain liable to Factor for any and all unpaid Accounts, and for all other amounts and monies as may be owed to Factor under the terms and conditions of this Agreement. Upon termination, any security reserve and any other funds or monies from any source whatsoever which would otherwise be owing to Assignor by Factor may be retained by Factor until such time as all obligations and debts of Assignor to Factor have been fully satisfied, and Factor's security interest provided in Section 4 hereof shall continue until all obligations of Assignor to Factor are paid in full. Factor shall have the right, in its sole discretion, to set off against the security reserve and any other sums owing to Assignor by Factor all obligations and debts of Assignor to Factor.

## SECTION 12.  MODIFICATION, SEVERABILITY, SUCCESSORS AND ASSIGNS, ETC.

This Agreement may be modified only by written instrument signed by the parties hereto.  In the event that any one or more of the provisions contained in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement.  This Agreement supersedes all prior agreements between the parties, and shall bind the successors and assigns of Assignor and shall inure to the benefit of the successors and assigns of Factor.  As used in this Agreement, the singular shall be deemed to include the plural and vice versa, and the neuter shall be deemed to include the masculine or feminine, and vice versa.

## SECTION 13.  NO DELAY

13.1  No delay or omission on the part of Factor in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right.  The waiver by Factor of the breach by Assignor of any provision of this Agreement, or of Assignor's compliance with such provisions, shall not be construed as a waiver of any other breach or of the provision itself.  No waiver or modification of the Agreement shall be chargeable against Factor unless in writing, signed by Factor and delivered by Factor to Assignor.

13.2  The waiver, compromise, discharge, extension or release by Factor, of any duty or obligation of any Account Debtor shall not reduce, diminish, limit, or restrict in any way Assignor's obligations and liabilities to Factor.

## SECTION 14.  NOTICE

Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, addressed to the addressees set forth below, or to such other address as either party notifies the other in writing.  All such notices shall be effective upon receipt if delivered by hand or overnight delivery service; otherwise upon three (3) business days after the notice is placed in the U.S. Mail.  Addresses for notices are as follows:

In the case of Assignor, to:                       In the case of Factor, to:

**BMX TRANSPORT L.L.C.**                       **RTS FINANCIAL SERVICE, INC.**
**2850 HOG MOUNTAIN RD STE 202**              **9300 METCALF AVE**
**DACULA, GA 30019**                          **OVERLAND PARK, KS 66212**
**TEL:  470-282-0987**                        **TEL:  800-860-7926**

## SECTION 15.  COUNTERPARTS; FACSIMILE SIGNATURES

This Agreement may be executed in one or more counterparts and by different signatories thereto, all of which counterparts, when taken together, shall constitute but one agreement.  This Agreement may be validly executed and delivered by facsimile or other electronic transmission and any such execution or delivery shall be fully effective as if executed and delivered in person.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, as of **APRIL 12, 2021**.

ASSIGNOR:
**BMX TRANSPORT L.L.C.**
**MC# 753411**

By: _____    By: _____

ILYA STEPANSKIY                        JOHN ION TACU
Title:  MEMBER/MANAGER                 Title:  MEMBER/MANAGER

FACTOR:
**RTS FINANCIAL SERVICE, INC.**

By: _____

Title:  VICE-PRESIDENT

DocuSign Envelope ID: F5073717-25B7-4632-9B4E-28AA367E1FDD

# GUARANTY

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **APRIL 12, 2021** ("the Factoring Agreement") with **BMX TRANSPORT L.L.C. ("ASSIGNOR"),** I the undersigned, do hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** under the Factoring Agreement and any related guarantees associated with the Factoring Agreement and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement and related guarantees have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement, or any third parties under any guarantees associated with the Factoring Agreement, that has not been settled or discharged in full. The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power. Whether or not suit be initiated, the undersigned agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by **RTS** in enforcing this guaranty and in any actions or proceedings arising out of or relating to the guaranty. To secure the undersigned's obligations to **RTS** under this Guaranty and to the extent permitted by applicable law, **RTS** reserves a right of setoff in any factoring accounts held by **RTS** relating to the undersigned. The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future. The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts. The undersigned hereby grants to **RTS** a continuing security interest in all of the undersigned's assets, including, but not limited to, all equipment, inventory, all real and personal property, existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral"). **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral. To the extent **ASSIGNOR** guarantees the obligations of a third party that results in a negative balance due by **ASSIGNOR** to **RTS** under the Factoring Agreement between **RTS** and **ASSIGNOR**, I hereby understand and agree that this guaranty shall also apply to those third party obligations and I shall be personally liable for the obligations of such third party under this guaranty to the extent **ASSIGNOR** is obligated to **RTS** under the respective Factoring Agreement and related guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

DocuSigned by:

*ILYA STEPANSKIY*

33493B40CC98411...

ILYA STEPANSKIY
2485 WEBER HEIGHTS WAY
BUFORD, GA 30519

DocuSigned by:

*John Tacu*

8D88D3A221224BA...

JOHN ION TACU
4250 RIDGE RD
BUFORD, GA 30519

9

DocuSign Envelope ID: F5073717-25B7-4632-9B4E-28AA367411FDD

# CERTIFIED COPY OF RESOLUTIONS
## (LLC)

"**RESOLVED**, that the Factoring Agreement dated **APRIL 12, 2021** between **BMX TRANSPORT L.L.C.** ("this company") and **RTS FINANCIAL SERVICE, INC. ("RTS")** and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and he hereby is authorized and directed to enter into said agreement and all other agreements and documents connected therewith and to execute the same for and on behalf of this company on the terms and conditions set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and hereby is authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of, this company, such agreements, amendments, and supplements to said agreement or any other agreement or document connected therewith, documents, instruments, certificates, notices and further assurances and to perform any and all such acts and things as may be required by **RTS** in connection with said agreement or any other agreement or document connected therewith, or may to him seem necessary or proper to implement and effect complete consummation of said agreement or any other agreement or document connected therewith in all respects and the purposes set forth in these resolutions";

"**RESOLVED,** that these resolutions shall remain in full force and effect until all indebtedness and obligations arising out of said agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full."

The undersigned, being all of the Members and Managers of **BMX TRANSPORT L.L.C.** do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Members and Managers of **BMX TRANSPORT L.L.C.**, a **Georgia** limited liability company, duly called, noticed and held on **APRIL 12, 2021**, at which meeting there were at all times present and acting Members and Managers of the company; and that said resolutions are in full force and effect; and that the following is a true and correct list of all of the Members and Managers of **BMX TRANSPORT L.L.C.**.

_ILYA STEPANSKIY, Member / Manager_

ILYA STEPANSKIY, Member / Manager

Date: _____4/15/2021_____

_John Tacu_

JOHN ION TACU, Member / Manager

Date: _____4/16/2021_____



**RTS** FINANCIAL™

9300 Metcalf Ave
Overland Park, KS 66212

**APRIL 12, 2021**

**ATTN:  Accounts Payable Manager**

Effective with the presentation of this letter be advised that **BMX TRANSPORT L.L.C.** has retained the services of RTS Financial Service, Inc. in an effort to give us greater efficiency in our credit and collection departments.

Therefore, effective with presentation of **BMX TRANSPORT L.L.C.** freight bills, all invoices will be processed through RTS Financial Service, Inc., **thus assigning all payments to RTS Financial Service, Inc.  All payments must be mailed directly to**:

**RTS Financial Service, Inc.**

**PO Box 840267**
**Dallas, TX 75284-0267**
**(800) 860-7926**

Please promptly notify RTS Financial Service, Inc. of any claims, returns, questions, or dispute which may affect payment.  If you pay anyone other than RTS Financial Service, Inc. without the prior written consent of RTS Financial Service, Inc., you will be required by law to pay the amount again to RTS Financial Service, Inc. We ask that you please provide the following information with your payment remittance:

1. The carrier name – **"BMX TRANSPORT L.L.C."**
2. The invoice number(s)
3. Individual invoice amount

Your compliance with this notification is greatly appreciated.  If you have any questions regarding the program, please do not hesitate to contact RTS @ 800-860-7926.  This assignment letter may only be revoked by a writing signed by **both RTS FINANCIAL SERVICE, INC.** and **BMX TRANSPORT L.L.C.**.

Sincerely,

_ILYA STEPANSKIY_

_____                    _____
**Vice-President**                              **ILYA STEPANSKIY**
**RTS FINANCIAL SERVICE, INC**                  **BMX TRANSPORT L.L.C.**
                                                **2850 HOG MOUNTAIN RD STE 202**
                                                **DACULA, GA  30019**
                                                **TIN: 45-2492599**
                                                **MC: 753411**

Please continue to send all 1099 tax forms directly to: **BMX TRANSPORT L.L.C.**.

DocuSign Envelope ID: F5073717-25B7-4632-9B4E-28AA367441DD

# ⬤RTS FINANCIAL™

9300 Metcalf Ave
Overland Park, KS 66212

**APRIL 12, 2021**

**ATTN:  Accounts Payable Manager**

Effective with the presentation of this letter be advised that **BMX TRANSPORT L.L.C.**, has retained the services of RTS Financial Service, Inc. in an effort to give us greater efficiency in our credit and collection departments.

Therefore, effective with presentation of **BMX TRANSPORT L.L.C.** freight bills, all invoices will be processed through RTS Financial Service, Inc., **thus assigning all payments to RTS Financial Service, Inc.  All payments must be mailed directly to**:

**RTS Financial Service, Inc.**

**PO Box 840267**
**Dallas, TX 75284-0267**
**(800) 860-7926**

Please promptly notify RTS Financial Service, Inc. of any claims, returns, questions, or dispute, which may affect payment.  If you pay anyone other than RTS Financial Service, Inc. without prior written consent, you will be required by law to pay the amount again to RTS Financial Service, Inc.  We ask that you please **sign and return a copy of this letter to RTS Financial Service, Inc. as your acknowledgement of the aforementioned "Notification of Assignment".**

Your compliance with this notification is greatly appreciated.  If you have any questions regarding the program, please do not hesitate to contact RTS @ 800-860-7926.  This assignment letter may only be revoked by a writing signed by **both RTS FINANCIAL SERVICE, INC**. and **BMX TRANSPORT L.L.C.**.

Sincerely,

DocuSigned by:

*ILYA STEPANSKIY*

33493B40CC98411...

_____
**Vice-President**
**RTS FINANCIAL SERVICE, INC**

**ILYA STEPANSKIY**
**BMX TRANSPORT L.L.C.**
**2850 HOG MOUNTAIN RD STE 202**
**DACULA, GA  30019**
**TIN: 45-2492599**
**MC: 753411**

**ACCOUNTS PAYABLE DEPARTMENT:**

By receipt of this letter, I acknowledge assigning the payment of receivables direct to RTS Financial Service.

Company Name_____

Address_____City/State/Zip _____

Acknowledged By:_____
                                        SIGNATURE                          TITLE                          DATE

Please print name:_____
                                     **FAX TO: (913) 492-1998**

Please continue to send all 1099 tax forms directly to: **BMX TRANSPORT L.L.C.**.

# GUARANTY AND SECURITY AGREEMENT

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **APRIL 12, 2021** (the "Factoring Agreement") with **BMX TRANSPORT L.L.C. ("ASSIGNOR")**,  the undersigned corporation, does hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance.  This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement that has not been settled or discharged in full.  The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power.  Whether or not suit is initiated, the undersigned agrees to pay reasonable attorney's fees and all other costs and expenses incurred by **RTS** in enforcing this Guaranty and Security Agreement and in any actions or proceedings arising out of or relating to the Guaranty and Security Agreement.  To secure its obligations to **RTS** under this Guaranty and Security Agreement and to the extent permitted by applicable law, 1) **RTS** reserves a right of setoff in all of factoring accounts held by **RTS** relating to the undersigned corporation [The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future.  The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty and Security Agreement against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts]; and 2) the undersigned corporation hereby grants to **RTS** a continuing security interest in all of the undersigned corporation's presently existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral").  **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral.  This Guaranty and Security Agreement shall be governed and construed in accordance with the laws of the state of Kansas.  The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this Guaranty and Security Agreement.

**GMX TRANS, INC.**

By: _____

            DocuSigned by:
            *John Tacu*
            8D88D3A221224BA...

**JOHN ION TACU**
**PRESIDENT**

# GUARANTY AND SECURITY AGREEMENT

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **APRIL 12, 2021** (the "Factoring Agreement") with **GMX TRANS, INC. ("ASSIGNOR")**, the undersigned corporation, does hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement that has not been settled or discharged in full. The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power. Whether or not suit is initiated, the undersigned agrees to pay reasonable attorney's fees and all other costs and expenses incurred by **RTS** in enforcing this Guaranty and Security Agreement and in any actions or proceedings arising out of or relating to the Guaranty and Security Agreement. To secure its obligations to **RTS** under this Guaranty and Security Agreement and to the extent permitted by applicable law, 1) **RTS** reserves a right of setoff in all of factoring accounts held by **RTS** relating to the undersigned corporation [The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future. The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty and Security Agreement against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts]; and 2) the undersigned corporation hereby grants to **RTS** a continuing security interest in all of the undersigned corporation's presently existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral"). **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral. This Guaranty and Security Agreement shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this Guaranty and Security Agreement.

**BMX TRANSPORT L.L.C.**

By: _____

DocuSigned by:

*ILYA STEPANSKIY*

33493B40CC98411...

**ILYA STEPANSKIY**
**MEMBER/MANAGER**



## Certificate Of Completion

Envelope Id: F50737172BB746329B4E28AA36711FDD
Subject: RTS Financial factoring agreement + Pilot Flying J Amendment
Document Type:
Source Envelope:
Document Pages: 14                         Signatures: 11
Certificate Pages: 5                       Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-06:00) Central Time (US & Canada)

Status: Completed

Envelope Originator:
Kim Zahner
9300 Metcalf Avenue, #301
Overland Park, KS  66212
kzahner@rtsfinancial.com
IP Address: 13.110.78.8

## Record Tracking

Status: Original
        4/13/2021 8:31:08 AM

Holder: Kim Zahner
        kzahner@rtsfinancial.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| John Tacu<br>gmxtrans14@gmail.com<br>President<br>GMX Trans Inc<br>Security Level: Email, Account Authentication (None) | *John Tacu*<br>8D88D3A221224BA... <br>Signature Adoption: Pre-selected Style<br>Using IP Address: 73.207.20.145 | Sent: 4/13/2021 8:35:16 AM<br>Resent: 4/16/2021 2:56:17 PM<br>Viewed: 4/16/2021 2:56:46 PM<br>Signed: 4/16/2021 2:57:06 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 4/7/2021 9:41:39 AM<br>ID: f5914a16-d23a-44e9-8ea6-61616a044dc1 | | |
| ILYA STEPANSKIY<br>bmxtransport@gmail.com<br>Owner<br>Security Level: Email, Account Authentication (None) | *ILYA STEPANSKIY*<br>33403FA0CC9B411<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 73.207.20.145 | Sent: 4/13/2021 8:35:16 AM<br>Viewed: 4/13/2021 12:16:17 PM<br>Signed: 4/15/2021 3:30:48 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 4/6/2021 3:36:07 PM<br>ID: f54471d8-28ce-4bcb-9298-465af02066e4 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/13/2021 8:35:16 AM |
| Certified Delivered | Security Checked | 4/13/2021 12:16:17 PM |
| Signing Complete | Security Checked | 4/15/2021 3:30:48 PM |
| Completed | Security Checked | 4/16/2021 2:57:06 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on 10/25/2018 3:00:34 PM
Parties agreed to: John Tacu, ILYA STEPANSKIY

Case 25-20705-JTS    Doc 20    Filed 05/22/25    Entered 05/22/25 22:49:41    Desc Main
Document    Page 32 of 56

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Shamrock Trading - DSFS Account (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

## Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

## Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

## Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

## All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Shamrock Trading - DSFS Account:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: rjanuary@rtsfinancial.com

**To advise Shamrock Trading - DSFS Account of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at rjanuary@rtsfinancial.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Shamrock Trading - DSFS Account**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to rjanuary@rtsfinancial.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Shamrock Trading - DSFS Account**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to rjanuary@rtsfinancial.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Shamrock Trading - DSFS Account as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Shamrock Trading - DSFS Account during the course of your relationship with Shamrock Trading - DSFS Account.

**Amendment #1 (Bundled Pricing Programs)**
**To Factoring Agreement Dated APRIL 12, 2021**

The above referenced Factoring Agreement (the "Agreement") by and between **BMX TRANSPORT L.L.C.** ("Assignor") and RTS Financial Service, Inc. ("Factor") is hereby amended in the following particulars effective as of April 12, 2021 (as amended, the "Agreement"):

1.   "Section 3. Purchase Price and Factoring Charge; Security Reserves" is deleted in its entirety and replaced with the following new Section 3 (the "Bundled Pricing"):

   3.1 The purchase price for each Account purchased by Factor hereunder shall be the net amount of such Account, less the Factor's fee, which fee shall be an amount equal to **EIGHT TENTHS PERCENT (.8%)** of such net amount. "Net amount" means the gross amount of the Account less any discount or allowance of any nature allowed to the Account Debtor. Throughout the term of this Agreement, Factor will review the US Prime Rate ("Prime") in effect as of the first business day of each calendar month and, in the event that the then current Prime changes, the parties hereby agree to a commensurate charge equal to the difference between the effective Prime in effect at the beginning of the month and a base Prime rate of 3.25%. Notwithstanding anything contained herein and to the contrary, Prime will always be the greater of the base Prime rate of 3.25% or the effective Prime at the beginning of the month, whichever is higher.

   3.2 Payment of the purchase price to Assignor shall be made as follows:

   (a) Upon the presentation by Assignor to Factor of documents reasonably acceptable to Factor, for an Account approved for purchase by Factor, and provided no claim or dispute shall then exist with the Account Debtor as to the Account, Factor will advance to the Assignor the purchase price of the Account, less a security reserve equal to **ONE AND TWO TENTHS PERCENT (1.2%)** of the net amount of the Account.

   (b) Upon Factor's receipt of full payment of the invoice for the Account from the Account Debtor, and provided Assignor shall not otherwise be in default in any respect under this Agreement, Factor will remit to the Assignor the security reserve in complete and full payment of the purchase price. In all cases, Factor will also retain its Factor's fee.

2.   Assignor hereby acknowledges and agrees that (i) the pricing above is being provided pursuant to a bundled program between Factor, Assignor and Pilot Travel Centers LLC and its various subsidiaries ("Pilot") as separately agreed to by the parties (the "Bundled Agreement"); (ii) the Bundled Pricing provided herein is subject to Assignor not being in default of the Bundled Agreement, (iii) Factor may share the terms of the Agreement and any of Assignor's account information and data (including any data and opinions relating to Assignor's creditworthiness) with Pilot as requested by Pilot, and (iv) Factor may rely on information otherwise available to Factor through its affiliate RTS Carriers Services, Inc. ("RTS Carrier Services") or correspondence from Pilot to determine if Assignor has defaulted on its commitments to qualify for the Bundled Pricing.

3.   If Assignor defaults on any of its obligations to Factor or any its obligations to Pilot required to qualify for the Bundled Pricing, this Amendment and the Bundled Pricing provided herein may be terminated by Factor at any time thereafter at Factor's sole discretion and the pricing and other terms provided herein shall otherwise default back to the rates in place prior to the execution of this Amendment throughout the remainder of the Agreement or until otherwise modified by the parties in writing.

4.   Assignor is working with Factor's affiliate RTS Carrier Services and desires to obtain fuel discounts, credit terms and other perks with Pilot. As a condition to obtaining the desired discounts and perks, Assignor hereby agrees to the following terms and conditions that shall apply at any point in time Assignor has a balance due to Pilot for any reason:

   (a) Assignor hereby authorizes Carrier Services and/or Pilot to share with Factor all information regarding the status of Assignors account(s) including, but not limited to, if Assignor has defaulted in any manner on its payment obligations to Pilot and the current amount due ("Payment Default");

   (b) In the event of a Payment Default, Pilot and Carrier Services shall have the immediate right to demand that Factor forward all funds (or a lessor amount if acceptable to Pilot) then due to Assignor under the Factoring Agreement directly to Pilot instead of Assignor until the Payment Default has been paid in full and Factor is hereby authorized to comply with these demands;

1

(c) All such advances made by Factor directly to Pilot as provided herein shall be deemed to have been disbursed in full to Assignor for purposes of calculating Factor's obligations to Assignor under the Factoring Agreement;

(d) Assignor hereby authorizes Factor to share any and all account information with Carrier Services and/or Pilot as requested including, but not limited to, information relating to the invoices submitted by Assignor to Factor, account status, current account balance, and account history; and

(e) The parties hereby acknowledge and agree that the fuel discounts, credit terms and other perks offered to Assignor can be immediately terminated at any time and for any reason upon written notice to Assignor by Factor, Carrier Services or Pilot.

5. RTS Carrier Services and Pilot are hereby added as third party beneficiaries of this Agreement for purposes stated in this Amendment.

6. This Amendment constitutes a commencement of a new Original Term as defined in Section 11.1 of the Factoring Agreement. Successive Renewal Periods shall now commence as of the date of this Amendment.

7. Except as amended herein, all of the other terms, conditions, and provisions of the Agreement shall remain in full force and effect.

**BMX TRANSPORT L.L.C.**                    **RTS FINANCIAL SERVICE, INC.**

By: _ILYA STEPANSKIY_                       By: _____
    33493B40CC98411...

Name:   ILYA STEPANSKIY
Title:   MEMBER/MANAGER                      Title:    VICE-PRESIDENT

Date: ___4/15/2021___                        Date: _____

2

## **<u>Exhibit B</u>**

**The DIP Factoring Agreement**

# FACTORING AGREEMENT

THIS FACTORING AGREEMENT (the "Agreement") made and entered into this **05/22/2025 (**the "Effective Date") by and between **RTS FINANCIAL SERVICE, INC.**, ("Factor"), a Kansas Corporation; and **BMX TRANSPORT L.L.C.** ("Assignor"), a **Limited Liability Company** in the state of **Georgia**., as a Debtor-in-Possession ("DIP") in the Case, as defined below.

## RECITALS

1.  Assignor desires to sell to Factor all of its existing and future Accounts Receivable ("Accounts") arising from services performed in the regular course of Assignor's business; and

2.  Factor desires to purchase certain of those Accounts, which Factor in its sole discretion deems acceptable for purchase, according to the terms and conditions provided in this Agreement.

3.  Assignor represents that it intends to file Chapter 11 bankruptcy in a federal court in the state of Georgia ("the Court"), (case number to be included after filing **2025-bk-20705** the "Case")). The "Petition Date" shall be the date the first Chapter 11 petition is filed. After the Petition Date, Assignor represents that it intends to operate its business as a Debtor-in-Possession pursuant to Chapter 11 U.S.C § 101 et. Seq. (the "Bankruptcy Code"). These representations are material to and conditions precedent to the enforceability of this Agreement against Factor.

4.  This Agreement is, in all respects, subject to the approval of the Court, by an interim order ("Interim Order") issued in the Case and, after due delays, a final order ("Final Order"); and

5.  Upon entry of Interim Order, the applicable terms and conditions of this Agreement shall apply to all Accounts purchased by Factor *nunc pro tunc* to the Petition Date.

In consideration of the above recitals and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION 1.  DEFINITIONS

An "Account" means any right to payment for services rendered by or on behalf of Assignor.  "Account Debtor" means a person or other entity, which is obligated to pay the Account.

## SECTION 2.  PURCHASE OF ACCOUNTS

2.1  Assignor agrees to present to Factor for purchase, with recourse, all Accounts arising from the activities and services performed by Assignor.

2.2 Factor, in its sole discretion, may purchase such Accounts from Assignor as Factor determines to be acceptable. Assignor hereby agrees to sell, assign, transfer, convey and deliver to Factor, such Accounts as Factor shall elect to purchase.  Assignor will notify each Account Debtor of the sale of its Account or Accounts to Factor and shall place a clear statement or legend, approved by Factor, on each such Account invoice, purchase order, or statement, stating that such Account has been sold and assigned, and is payable to Factor at its office at 9300 Metcalf Ave., Overland Park, Kansas 66212 or at such other address as Factor shall designate in writing.  Factor shall become the absolute owner of all Accounts purchased hereunder.  All remittances received by Assignor for payment of Accounts sold to Factor are the property of Factor, and Assignor shall hold such proceeds in trust for Factor, and shall immediately deliver to Factor, in the identical form, all payments received by Assignor on each such Account, together with all documents accompanying the remittance to Assignor.  Assignor guarantees the timely payment of the monies and amounts represented by the assigned Accounts.  Factor will not purchase Accounts representing services for which assignor did not in fact act as a Transportation Carrier.

## SECTION 3.  PURCHASE PRICE AND FACTORING CHARGE; SECURITY RESERVES

3.1 The purchase price for each Account purchased by Factor hereunder shall be the net amount of such Account, less the Factor's fee, which fee shall be an amount equal to **TWO PERCENT (2.00%)** of such net amount.  "Net amount" means the gross amount of the Account less any discount or allowance of any nature allowed to the Account Debtor.

3.2    Payment of the purchase price to Assignor shall be made as follows:

(a) Upon the presentation by Assignor to Factor of documents reasonably acceptable to Factor, for an Account approved for purchase by Factor, and provided no claim or dispute shall then exist with the Account Debtor as to the Account, Factor will advance to the Assignor the purchase price of the Account, less a security reserve equal to **ONE PERCENT (1.00%)** of the net amount of the Account.

(b) Upon Factor's receipt of full payment of the invoice for the Account from the Account Debtor, and provided Assignor shall not otherwise be in default in any respect under this Agreement, Factor will remit to the Assignor the security reserve in complete and full payment of the purchase price. In all cases, Factor will also retain its Factor's fee.

## SECTION 4.  SECURITY INTEREST

4.1 Assignor hereby grants to Factor as collateral, to secure all of the debts, liabilities and obligations of Assignor to Factor under this Agreement, including all costs and expenses incurred by Factor in connection with the enforcement of its rights under this Agreement, a security interest in the following property of Assignor: all assets, including, but not limited to, (a) all real and personal property, (b) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Assignor, together with all proceeds and monies due or becoming due on such Accounts; all guaranties, insurance and security for such Accounts; all security reserves related to such Accounts; all of Assignor's rights and interests in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefore as replacements and all additions thereto; (c) all of Assignor's chattel paper, instruments, general intangibles, securities, contract rights and insurance  associated with or related to the Accounts;  (d) all  equipment, inventory, and deposit accounts; and (e) all proceeds of any of the foregoing Accounts, property,  rights and interests.  Factor in its own name, or Factor's collateral agent in its name as the agent of Factor, may file financing statements and all amendments thereto describing as the collateral any or all of the foregoing collateral by any description Factor or its collateral agent deems appropriate in any jurisdiction or office Factor or its collateral agent deems appropriate to perfect Factor's security interest in foregoing collateral.

4.2 In the event of Assignor's breach of any warranty made in this Agreement or the Assignor's failure to observe or perform any of the provisions or obligations of this Agreement, Assignor shall be in default, and Factor may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the UCC as adopted and in force in the State of Kansas.  In addition, upon default by Assignor, Factor shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors, including, but not limited to, (i) in Assignor's name, or otherwise, demand, make claim for, sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts, (ii) notify Account Debtors of Factor's security interest, regardless if Assignor has sold an Account to Factor related to such Account Debtor and otherwise notify and instruct Account Debtors, in Assignor's name, of the address, and procedures for making payments to Factor, and (iii) take all reasonable steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement.  Factor's exercise of the foregoing rights shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing rights.  Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

4.3 To the extent permitted by an Interim or Final Order in the Case, Assignor further grants Factor the right to secure any obligations under this Agreement with the security interest and related collateral granted as part of any factoring agreement existing as of the Petition Date and, further, agrees that any obligation or default under any such factoring agreement existing as of the Petition Date may be cured by the rights, remedies, and security interest granted hereunder. These rights shall be collectively referred to as the rights of "Cross-Collateralization" between any factoring agreements.

## SECTION 5.  REPURCHASE OF ACCOUNTS

All Accounts purchased by Factor from Assignor are purchased with full recourse.  If Assignor breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if any Account purchased by Factor hereunder is not paid in full on or before the payment due date of such Account, then upon request by Factor, Assignor shall immediately repurchase such Account from Factor for an amount equal to the face amount of such Account (less any payments received by Factor on such Account from the Account Debtor), together with interest thereon at the rate of **ZERO%** per annum from the date of the assignment of such Account to Factor.  Any security reserve held by Factor for such Account shall be released only in accordance with Section 3.2(b), and Factor shall in all events also be entitled to and shall retain its Factor's fee on the Account.  Typically, Factor will require repurchase of any unpaid Account no later than 90 days after the Account invoice date, unless Factor, in its sole discretion chooses otherwise.  However, in all cases, any unpaid Account must be repurchased by Assignor within 120 days after the Account invoice date.  Assignor shall not be relieved of its absolute repurchase obligation hereunder, even though the Account Debtor, whose Account Assignor must repurchase hereunder, was listed on Factor's debtor credit rating list.

## SECTION 6.  REPRESENTATIONS AND WARRANTIES

Assignor represents, covenants, warrants and agrees as follows:

6.1      If Assignor is a corporation, that it is a corporation duly organized, existing and in good standing under the laws of the state of **Georgia**; that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action; and that this Agreement, when duly executed and delivered by the Assignor and the Factor, will constitute a legal, valid and binding agreement of the Assignor fully enforceable in accordance with its terms and conditions.

6.2      The Assignor's address set out in Section 14 of this Agreement is the address of Assignor's principal office and its sole place of business.  Assignor shall give Factor immediate written notice of any change in the location of its principal office, the addition of any new place or places of business and their addresses, any name change or the addition of any name under which Assignor does business, or any change in the nature or status of Assignor's business or operations.

6.3 As to each Account purchased by Factor under this Agreement:  (1) the Account is not yet past due, arose in the ordinary course of Assignor's business and represents a bona fide completed transaction; (2) the title of Assignor to the Account is absolute and subject to no assignment, claim, lien or security interest; (3) the Account, as shown on Assignor's books and records and on any invoices, bills of lading or statements, delivered to Factor is a legally enforceable debt owed by Account Debtor to Assignor in its full face amount; (4) no partial payment has been made by anyone on such Account; (5) the Account is not subject to any claims, either currently existing, or future claims that Factor can reasonably determine are forthcoming due to the filing of a bankruptcy or related action by any account debtor that may cause Factor to pay funds or return funds already received due to a preference action, fraudulent transfer, or otherwise; (6) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account; or (7) the Account is payable not more than thirty (30) days from the date of assignment of the Account to Factor.

6.4 Assignor shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Factor deems necessary to protect its interest under this Agreement.

6.5 Assignor shall indemnify, defend and hold Factor harmless from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Assignor, and from any losses, expenses, attorneys fees or other costs incurred by Factor caused by or arising out of any such defaults or breaches of this Agreement by the Assignor and from any costs expenses or attorneys fees incurred by Factor in enforcing Factor's rights under this Agreement; from any dispute or claim resulting in liability, loss, expense, cost or attorneys fees caused by or arising out of the rejection of any work performed or services rendered by Assignor; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor.

6.6 The Assignor shall not, without the express written consent of the Factor, release, compromise, settle or adjust any Account purchased hereunder, or grant any discounts, allowances or credits thereon.

**SECTION 7.  POWER OF ATTORNEY**

7.1 In order to carry out this Agreement, and to avoid unnecessary notification of Account Debtors, Assignor irrevocably appoints Factor as Assignor's true and lawful attorney with the full power and right to: (a) invoice or bill for, collect, receive, and deposit to Assignor's bank accounts any and all amounts which may be due or become due to Assignor from Account Debtors, and to use Assignor's name for purposes of billing and collection of any and all amounts due; (b) receive, accept, open, dispose of and redirect any and all mail addressed to Assignor;  (c) negotiate any checks received in payment of Accounts whether payable to Assignor or Factor or both, and endorse the name of Assignor on any checks or other evidences of payment or other instruments or documents that may come into the  possession of Factor on Accounts purchased by Factor and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Assignor to Factor; (d) in Assignor's name, or otherwise, demand, make claim for. sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts; (e) execute and deliver receipts or acknowledgments to Account Debtors for such amounts due which shall be binding upon Assignor and Factor; (f) notify Account Debtors of the sale of Accounts to Factor and notify and instruct Account Debtors, in Assignor's name, of the address and procedures for making payments on any Accounts that are sold to Factor or which constitute collateral hereby granted by Assignor to Factor; (g) take all steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement;   (h) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 4 hereof by any description Factor deems appropriate in any jurisdiction or office Factor deems appropriate to perfect its security interest in the collateral described in Section 4 hereof; and (i) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Assignor wherever located in order to satisfy any obligations of Assignor to Factor under this Agreement.  It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Assignor to Factor under this Agreement have been satisfied.

7.2 Exercise of the foregoing powers shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing powers.  Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

7.3  The Factor shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account.

## SECTION 8.  BOOKS, RECORDS AND FINANCIAL STATEMENTS

All of Assignor's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Assignor's Accounts and business shall be accurately and properly prepared and maintained by Assignor and shall disclose the sale of Accounts purchased by Factor.  All such books, ledgers, accounts, records, correspondence and papers shall be opened by Assignor at all reasonable times for Factor's inspection, audit and copying.  Upon request, but not more often than quarter annually, Assignor shall furnish Factor with financial statements including income statements and balance sheets showing Assignor's financial condition.  Upon request, Assignor shall also provide Factor with annual financial statements acceptable to Factor.

## SECTION 9.  ATTORNEY'S FEES AND EXPENSES

9.1 RTS shall be entitled to recover all of its reasonable out of pocket expenses, including reasonable consultants, attorneys, and paralegal fees, costs, and expenses, incurred in connection with the Case. Accordingly, the Assignor shall pay Factor or Factor shall be authorized to automatically deduct from any monies that would be paid to Assignor for the purchase of an Account, or any monies collected on a purchased Account, all reasonable out-of-pocket fees and expenses related to the Chapter 11 Case, including reasonable consultants, outside attorneys and paralegal fees, costs, and expenses.

9.2 If Factor retains the services of an attorney to enforce any obligation of Assignor to Factor under this Agreement, Factor shall be entitled to recover from Assignor all attorneys fees, court costs and expenses, regardless of whether or not an action is commenced.

## SECTION 10.  GOVERNING LAW AND CONSENT TO JURISDICTION

10.1    This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.

10.2    Factor and Assignor agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in the Court. Factor and Assignor submit to the jurisdiction of the Court for the purpose of deciding any questions, disputes or causes, arising under this Agreement.

## SECTION 11.  TERMINATION

11.1 This Agreement shall have an initial term of twelve (12) months from the Effective Date hereof (the "Original Term"), and shall automatically renew for successive periods of twelve (12) months ("Renewal Periods"), unless sooner terminated as hereinafter provided. Assignor may terminate this Agreement as of the expiration of the Original Term or any Renewal Term by giving Factor prior written notice of its intention to so terminate; provided, however, that any presentation of Accounts by Assignor to Factor for funding after the termination date shall cancel any prior termination notice and renew this Agreement for another Renewal Period. Such notice shall be given by Assignor to Factor at least sixty (60) days, but not more than ninety (90) days, prior to the expiration of the Original Term or any Renewal Term. Factor may terminate this Agreement at any time upon thirty (30) days prior written notice to Assignor; provided however, that this Agreement shall terminate immediately, at the option of Factor, upon the insolvency of the Assignor or the filing of a petition in bankruptcy by or against the Assignor or upon any default or breach of this Agreement by Assignor. Assignor hereby acknowledges and agrees that Factor will incur significant time and expense setting up this financing relationship (the "Due Diligence Expenses").  In the event that Factor does not purchase any Accounts from Assignor under this Agreement for any reason out of the control of Factor (including, but not limited to, the inability of Assignor to completely terminate its relationship with another financing company), Assignor hereby agrees to pay Factor a fee equal to $5,000.00 to cover the Due Diligence Expenses, plus any reasonable costs and attorney fees incurred by Factor related to providing DIP factoring services in the Case.

11.2 All of the Assignor's covenants, warranties and agreements under this Agreement made to Factor, and all rights and remedies of the Factor under this Agreement, shall survive the termination of this Agreement and shall continue in full force and effect until all Accounts purchased hereunder are paid in full and all debts and obligations to of Assignor to Factor hereunder have been satisfied in full. Upon termination Assignor shall remain liable to Factor for any and all unpaid Accounts, and for all other amounts and monies as may be owed to Factor under the terms and conditions of this Agreement. Upon termination, any security reserve and any other funds or monies from any source whatsoever which would otherwise be owing to Assignor by Factor may be retained by Factor until such time as all obligations and debts of Assignor to Factor have been fully satisfied, and Factor's security interest provided in Section 4 hereof shall continue until all obligations of Assignor to Factor are paid in full. Factor shall have the right, in its sole discretion, to set off

against the security reserve and any other sums owing to Assignor by Factor all obligations and debts of Assignor to Factor.

**SECTION 12.  MODIFICATION, SEVERABILITY, SUCCESSORS AND ASSIGNS, ETC.**

This Agreement may be modified only by written instrument signed by the parties hereto.  In the event that any one or more of the provisions contained in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement.  This Agreement supersedes all prior agreements between the parties, and shall bind the successors and assigns of Assignor and shall inure to the benefit of the successors and assigns of Factor.  As used in this Agreement, the singular shall be deemed to include the plural and vice versa, and the neuter shall be deemed to include the masculine or feminine, and vice versa.

**SECTION 13.  NO DELAY**

13.1   No delay or omission on the part of Factor in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right.  The waiver by Factor of the breach by Assignor of any provision of this Agreement, or of Assignor's compliance with such provisions, shall not be construed as a waiver of any other breach or of the provision itself.  No waiver or modification of the Agreement shall be chargeable against Factor unless in writing, signed by Factor and delivered by Factor to Assignor.

13.2   The waiver, compromise, discharge, extension or release by Factor, of any duty or obligation of any Account Debtor shall not reduce, diminish, limit, or restrict in any way Assignor's obligations and liabilities to Factor.

**SECTION 14.  NOTICE**

Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, addressed to the addressees set forth below, or to such other address as either party notifies the other in writing.  All such notices shall be effective upon receipt if delivered by hand or overnight delivery service; otherwise upon three (3) business days after the notice is placed in the U.S. Mail.  Addresses for notices are as follows:

In the case of Assignor, to:                           In the case of Factor, to:

**BMX TRANSPORT L.L.C.**                         **RTS FINANCIAL SERVICE, INC.**
**2850 HOG MOUNTAIN RD STE 202**                 **9300 METCALF AVE**
**DACULA, GA 30019**                             **OVERLAND PARK, KS 66212**
**TEL:  470-282-0987**                           **TEL:  800-860-7926**

**SECTION 15.  COUNTERPARTS; FACSIMILE SIGNATURES**

This Agreement may be executed in one or more counterparts and by different signatories thereto, all of which counterparts, when taken together, shall constitute but one agreement.  This Agreement may be validly executed and delivered by facsimile or other electronic transmission and any such execution or delivery shall be fully effective as if executed and delivered in person.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, as of **05/22/2025**.

ASSIGNOR:
**BMX TRANSPORT L.L.C.**
**2850 HOG MOUNTAIN RD STE 202**
**DACULA, GA 30019**

By:  _Ilya Stepanskiy_____
Ilya Stepanskiy
Title:  member

FACTOR:
**RTS FINANCIAL SERVICE, INC.**

By:  _____

Title:   VICE-PRESIDENT

## <u>LIMITED POWER OF ATTORNEY</u>

The undersigned (the "Taxpayer") hereby designates, constitutes, and appoints RTS Financial Service, Inc., a Kansas corporation ("RTS"), and the officers of RTS, each with its mailing address at P.O. Box 14648, Shawnee Mission, KS 66285, and each authorized to act alone, as its true and lawful attorney-in-fact for the following purposes:

1. To request, receive and inspect confidential tax information of Taxpayer with respect to any and all tax periods (past, present or future) and any and all types of taxes which may apply to Taxpayer (including, without limitation, income and employment taxes) for purposes of determining and monitoring the existence of any tax liens upon the assets of Taxpayer and to execute and deliver on behalf of Taxpayer any forms necessary to authorize the power-of-attorney's receipt of any such confidential tax information, including, but not limited to, Internal Revenue Service Forms 2848 and 8821.

2. Without limiting the general grant of authority contained in the preceding paragraph, to request, receive and inspect confidential tax information of Taxpayer with respect to the following specific tax periods and types of taxes:

| Types of Tax | Tax Form Numbers | Years or Periods |
|---|---|---|
| Withholding/Civil Penalty/ | 941/943/944/945/6672/ | 2020 thru 2027 |
| Excise | 720/8804/Civ Pen | |
| Unemployment/ | 940/2290/Civ Pen | 2020 thru 2027 |
| Heavy Use/Civil Penalty | | |
| Income | 1065/1120/1120S/990 | 2020 thru 2027 |

3. To designate any employee or agent of RTS as an additional or substitute attorney-in-fact of Taxpayer under this power of attorney.

The power of attorney set forth herein shall be deemed coupled with an interest and shall remain in effect until all obligations of Taxpayer to RTS under that certain Factoring Agreement by and between Taxpayer and RTS, dated **05/22/2025**, have been satisfied.

DATED **05/22/2025**.

TAXPAYER:  BMX TRANSPORT L.L.C.
              As Debtor-in-Possession

ADDRESS:  2850 HOG MOUNTAIN RD STE 202
             DACULA, GA 30019

TIN: 45-2492599

SIGNATURE:  *Ilya Stepanskiy*
NAME:  Ilya Stepanskiy
TITLE:  member

# GUARANTY

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **05/22/2025** ("the Factoring Agreement") with **BMX TRANSPORT L.L.C. as Debtor-in-Possession ("ASSIGNOR"),** I the undersigned, do hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** under the Factoring Agreement and any related guarantees associated with the Factoring Agreement and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement and related guarantees have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement, or any third parties under any guarantees associated with the Factoring Agreement, that has not been settled or discharged in full. The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power. Whether or not suit be initiated, the undersigned agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by **RTS** in enforcing this guaranty and in any actions or proceedings arising out of or relating to the guaranty. To secure the undersigned's obligations to **RTS** under this Guaranty and to the extent permitted by applicable law, **RTS** reserves a right of setoff in any factoring accounts held by **RTS** relating to the undersigned. The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future. The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts. The undersigned hereby grants to **RTS** a continuing security interest in all of the undersigned's assets, including, but not limited to, all equipment, inventory, all real and personal property, existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral"). **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral. To the extent **ASSIGNOR** guarantees the obligations of a third party that results in a negative balance due by **ASSIGNOR** to **RTS** under the Factoring Agreement between **RTS** and **ASSIGNOR**, I hereby understand and agree that this guaranty shall also apply to those third party obligations and I shall be personally liable for the obligations of such third party under this guaranty to the extent **ASSIGNOR** is obligated to **RTS** under the respective Factoring Agreement and related guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

*Ilya Stepanskiy*

Ilya Stepanskiy

# CERTIFIED COPY OF RESOLUTIONS
### (LLC)

"**RESOLVED**, that the Factoring Agreement dated **05/22/2025** between **BMX TRANSPORT L.L.C.., as Debtor-in-Possession** ("this company") and **RTS FINANCIAL SERVICE, INC. ("RTS")** and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and he hereby is authorized and directed to enter into said agreement and all other agreements and documents connected therewith and to execute the same for and on behalf of this company on the terms and conditions set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and hereby is authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of, this company, such agreements, amendments, and supplements to said agreement or any other agreement or document connected therewith, documents, instruments, certificates, notices and further assurances and to perform any and all such acts and things as may be required by **RTS** in connection with said agreement or any other agreement or document connected therewith, or may to him seem necessary or proper to implement and effect complete consummation of said agreement or any other agreement or document connected therewith in all respects and the purposes set forth in these resolutions";

"**RESOLVED,** that these resolutions shall remain in full force and effect until all indebtedness and obligations arising out of said agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full."

The undersigned, being all of the Members and Managers of **BMX TRANSPORT L.L.C.** do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Members and Managers of **BMX TRANSPORT L.L.C. a Georgia** limited liability company, duly called, noticed and held on **05/22/2025** at which meeting there were at all times present and acting Members and Managers of the company; and that said resolutions are in full force and effect; and that the following is a true and correct list of all of the Members and Managers of **BMX TRANSPORT L.L.C.**

_Ilya Stepanskiy_
_____
Ilya Stepanskiy, Member / Manager


Date:  5/22/2025

**RTS** FINANCIAL™

05/22/2025

ATTN:  Accounts Payable Manager

Effective with the presentation of this letter be advised that **BMX TRANSPORT L.L.C., as Debtor-in-Possession,** has retained the services of RTS Financial Service, Inc. in an effort to give us greater efficiency in our credit and collection departments.

Therefore, effective with presentation of **BMX TRANSPORT L.L.C.** freight bills, all invoices will be processed through RTS Financial Service, Inc., **thus assigning all payments to RTS Financial Service, Inc.**

**\*\*Please Note\*\*** that ACH payments cannot be applied accurately without email remittance. Send complete remittance to cashapp@rtsfinancial.com to ensure that your payments are applied timely and accurately.

**All payments must be sent by ACH, wire, or mail as follows:**

| By Mail: | By Wire Transfer: | By ACH Transfer: |
|---|---|---|
| | BMX TRANSPORT L.L.C. | BMX TRANSPORT L.L.C. |
| RTS Financial Service, Inc. | RTS Financial Service, Inc. | RTS Financial Service, Inc. |
| P.O. Box 840267 | Bank of America | Bank of America |
| Dallas, Texas 75284-0267 | Routing #026009593 | Routing# 081000032 |
| (800) 860-7926 | Account #003490674221 | Account# 003490674221 |
| | SWIFT:BOFAUS3N | Remit:cashapp@rtsfinancial.com |

Please promptly notify RTS Financial Service, Inc. of any claims, returns, questions, or dispute which may affect payment.  If you pay anyone other than RTS Financial Service, Inc. without the prior written consent of RTS Financial Service, Inc., you will be required by law to pay the amount again to RTS Financial Service, Inc. We ask that you please provide the following information with your payment remittance:

1. The carrier name – **"BMX TRANSPORT L.L.C."**
2. The invoice number(s)
3. Individual invoice amount

Notice – This Assignment, as well as the payment instructions contained herein, may only be revoked or modified by an authorized officer of **RTS** and **BMX TRANSPORT L.L.C. HELP FIGHT FRAUD: If you have any questions, or to verify any bank account or address change requests, please call (800) 860-7926.  Your compliance with this notification is greatly appreciated.**

Sincerely,

*[signature]*
_____
**Vice-President**

**RTS FINANCIAL SERVICE, INC.**

*[signature] Ilya Stepanskiy*
_____
**Ilya Stepanskiy**
**BMX TRANSPORT L.L.C.**
**As Debtor-in-Possession**
**2850 HOG MOUNTAIN RD STE 202**
**DACULA, GA 30019**
**TIN: 45-2492599**
**MC: 753411**

Please continue to send all 1099 tax forms directly to: **BMX TRANSPORT L.L.C.**

**RTS** FINANCIAL™

02/12/2024

ATTN:  Accounts Payable Manager

Effective with the presentation of this letter be advised that **BMX TRANSPORT L.L.C.., as Debtor-in-Possession**, has retained the services of RTS Financial Service, Inc. in an effort to give us greater efficiency in our credit and collection departments.

Therefore, effective with presentation of **BMX TRANSPORT L.L.C.** freight bills, all invoices will be processed through RTS Financial Service, Inc., **thus assigning all payments to RTS Financial Service, Inc**

**\*\*Please Note\*\*** that ACH payments cannot be applied accurately without email remittance. Send complete remittance to cashapp@rtsfinancial.com to ensure that your payments are applied timely and accurately. **All payments must be sent by ACH, wire, or mail as follows:**

| By Mail: | By Wire Transfer: | By ACH Transfer: |
|---|---|---|
| | BMX TRANSPORT L.L.C.. | BMX TRANSPORT L.L.C. |
| **RTS Financial Service, Inc.** | **RTS Financial Service, Inc.** | **RTS Financial Service, Inc.** |
| **P.O. Box 840267** | **Bank of America** | **Bank of America** |
| **Dallas, Texas 75284-0267** | **Routing #026009593** | **Routing# 081000032** |
| **(800) 860-7926** | **Account #003490674221** | **Account# 003490674221** |
| | **SWIFT:BOFAUS3N** | **Remit:cashapp@rtsfinancial.com** |

If you pay anyone other than how provided herein without the prior written consent of RTS Financial Service, Inc., you will be required by law to pay the amount again to RTS Financial Service, Inc. We ask that you please provide the following information with your payment remittance:

1. The carrier name **– "BMX TRANSPORT L.L.C.**
2. The invoice number(s)
3. Individual invoice amount

> Notice **–** This Assignment, as well as the payment instructions contained herein, may only be revoked or modified by an authorized officer of **RTS** and **BMX TRANSPORT L.L.C..".  HELP FIGHT FRAUD! If you have any questions, or to verify any bank account or address change requests, please call (800) 860-7926.  Your compliance with this notification is greatly appreciated.**

Sincerely,

*[signature]*

**Vice-President**

**RTS FINANCIAL SERVICE, INC.**

*[signature: Ilya Stepanskiy]*

**Ilya Stepanskiy**
**BMX TRANSPORT L.L.C.**
**As Debtor-in-Possession**
**2850 HOG MOUNTAIN RD STE 202**
**DACULA, GA 30019**
**TIN: 45-2492599**
**MC: 753411**

---

Accounts Payable Department

Receipt of Notice of Assignment to RTS Financial Service, Inc. Acknowledged.  The undersigned agrees to notify RTS Financial Service, Inc. of any claims, returns, questions or disputes which may affect payment.

Company Name:_____

Address:_____

Acknowledged By:_____          _____
                              Name                                    Title                    Date
Signature:_____

Please Fax To: 913-492-1998
Please continue to send all 1099 tax forms directly to: **BMX TRANSPORT L.L.C.**

**Exhibit C**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| In re: | CASE NO. 25-20705-JRS |
| BMX TRANSPORT, LLC, | CHAPTER 11 |
| Debtor. | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO ENTER
INTO POSTPETITION FACTORING AGREEMENT SUPPLANTING ITS
EXISTING PREPETITION FACTORING AGREEMENT TO SELL
ACCOUNTS RECEIVABLE POST-PETITION AND TO INCUR CREDIT,
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO SECTIONS 361, 363
AND 364 OF THE BANKRUPTCY CODE, (III) MODIFYING THE AUTOMATIC
STAY, (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULE 4001(C)(2), AND (V) GRANTING RELATED RELIEF**

Upon the motion [Doc. ___] (the "**Motion**") [1] of the above-captioned Debtor and Debtor in possession (the "**Debtor**") for entry of an interim order (this "**Interim Order**") (i) authorizing the Debtor to obtain postpetition financing and use of Cash Collateral pursuant to sections 105(a), 362, 363, 364(c), and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), (ii) granting adequate protection pursuant to sections 361, 363 and 364 of the Bankruptcy Code, (iii) granting the DIP Lender DIP Liens (subject to the Carve- Out) in and upon the DIP Collateral pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, (iv) granting allowed DIP Superpriority Claims to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code, (v) modifying the automatic stay, (vi) scheduling a final hearing pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and (vii) granting related relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and the Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and,

---

[1]   All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

**IT IS HEREBY ORDERED THAT:**

1.      For the reasons set forth on the record at the Hearing, the Motion is GRANTED as set forth herein.

2.      The Court will hold a final hearing on the Motion (the "**Final Hearing**") on **June 26, 2025 at 10:30 a.m.** in Courtroom 103, U.S. Courthouse, 121 Spring Street SE, Gainesville, GA 30501, which may be attended in person or via the Court's Virtual Hearing Room. You may join the Virtual Hearing Room through the "Dial-in and Virtual Bankruptcy Hearing Information" link at the top of the homepage of the Court's website, www.ganb.uscourts.gov, or the link on the judge's webpage, which can also be found on the Court's website. Please also review the "Hearing Information" tab on the judge's webpage for further information about the hearing. You should be prepared to appear at the hearing via video, but you may leave your camera in the off position until the Court instructs otherwise. Unrepresented persons who do not have video capability may use the telephone dial-in information on the judge's webpage.

3.      The terms and conditions of the DIP Factoring Agreement are hereby approved and ratified on an interim basis only, and the Debtor are authorized and directed to comply with and perform all the terms and conditions contained therein on an interim basis. The failure to reference or discuss any particular provision of the DIP Factoring Agreement in this Interim Order shall not affect the validity or the enforceability of any such provision. In the event of a conflict between this Interim Order and the DIP Factoring Agreement, the terms of this Interim Order shall govern.

4.      The Debtor is hereby authorized to obtain postpetition financing from RTS in accordance with the terms of this Interim Order and the DIP Factoring Agreement pursuant to section 364(d) of the Bankruptcy Code pending the Final Hearing.

5.      In accordance with sections 364(c)(1) and 507(b) of the Bankruptcy Code and subject to the Adequate Protection Superpriority Claims (defined below), all DIP Obligations (as

defined in the DIP Factoring Agreement) under the DIP Facility shall constitute claims (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expense of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code and shall at all times be senior to the rights of the Debtor, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Case, except for the pre-existing secured claims and the Adequate Protection Liens.

6.    As security for the Debtor's DIP Obligations arising under or in connection with the DIP Factoring Agreement, the DIP Lender is hereby granted first-priority liens and security interests in all the collateral set forth in the DIP Factoring Agreement (the "**DIP Liens**"), junior only to the Carve-Out. Notwithstanding the foregoing, and for the avoidance of doubt, the DIP Lender is not granted a security interest in avoidance actions pursuant to chapter 5 of the Bankruptcy Code at this time pursuant to this Interim Order.

7.    In the event the adequate protection provided to RTS does not preserve the value of the Prepetition Collateral as of the Petition Date, then such party shall have a superpriority claim pursuant to section 507(b) of the Bankruptcy Code, having priority over all claims allowed under section 507(a) of the Bankruptcy Code (the "**Adequate Protection Superpriority Claims**").

8.    The DIP Liens granted to RTS pursuant to this Interim Order and the DIP Facility are deemed valid and perfected upon the entry of this Interim Order without the necessity of RTS taking possession or control of any collateral, or filing financing statements, mortgages, or other documents. Upon the request of RTS, the Debtor shall execute and deliver to the DIP Lender any and all UCC financing statements, mortgages, notes, assignments, or other instruments or documents considered by RTS necessary in order to perfect the DIP Liens; and the DIP Lender is

-4-

hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing.

9.      Additionally, to provide RTS adequate protection for the diminution in value of the Prepetition Collateral, RTS is hereby granted, pursuant to section 361 of the Bankruptcy Code replacement liens in the Prepetition Collateral (the "**Adequate Protection Liens**") which, for the avoidance of doubt, grant senior first-priority liens to RTS, subject only to the Carve-Out.

10.      The Adequate Protection Liens and all other security interests and priorities granted to RTS are deemed valid and perfected upon entry of this Interim Order without the necessity of RTS taking possession of any collateral, filing financing statements, mortgages or other documents. Upon the request of RTS, the Debtor shall execute and deliver to the same any and all UCC financing statements, mortgages, notes, assignments, or the other instruments or documents considered by such party as necessary in order to perfect the Adequate Protection Liens; and RTS is hereby granted relief from the automatic stay embodied in section 362(a) of the Bankruptcy Code to receive, file, and record the foregoing.

11.      Notwithstanding anything to the contrary in the DIP Factoring Agreement, no purported waiver of sections 506(c) of the Bankruptcy Code is effective pursuant to this Interim Order at this time.

12.      No cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b), 726 (to the extent permitted by law), 1113, 1114 or otherwise of the Bankruptcy Code, shall be senior to, equal to or *pari passu* with, the DIP Superiority Claims granted hereunder except as expressly set forth herein.

13.      Upon breach of the DIP Factoring Agreement or the DIP Orders, RTS may declare all obligations owing under the DIP Facility to be immediately due and payable and may declare

a determination of any further obligation to extend credit to the Debtor and exercise all other remedies set forth in the DIP Factoring Agreement.  Upon the occurrence of any such breach and following the giving of ten (10) business days' notice to counsel for the Debtor, counsel for any Committee appointed in the Chapter 11 Case, and the United States Trustee, RTS shall have immediate relief from the automatic stay and foreclose on all or any portion of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral, as permitted by applicable non-bankruptcy law.  Promptly upon receipt of such ten-business-days' notice from the DIP Lender, the Debtor shall post such notice on ECF, and the Debtor and any party-in-interest shall be entitled to an emergency hearing with this Court for the sole purpose of contesting whether an Event of Default has occurred.

14.     Pursuant to section 364(e) of the of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereinafter modified, vacated or stayed, such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, security interest, or liens granted by the Debtor to RTS, prior to the effective date of any such stay, modification, or vacation, or the validity and enforceability or priority of any lien or security interest authorized, granted or created pursuant to this Interim Order.

15.     The entry of this Interim Order is without prejudice to the rights of any party in interest, including the Official Committee of Unsecured Creditors (the "**Committee**"), if any, appointed in the Chapter 11 Case, to challenge the prepetition liens of the Prepetition Secured Lender or any other party to the extent such a right exists, provided however, any challenges to the validity, extent or priority of the liens or claims of the Prepetition Secured Lender or any other party, including the assertion of any claim under sections 510, 544, 547, or 548 of the Bankruptcy Code (collectively, "**Challenges**") must be commenced, subject to obtaining standing, within sixty

-6-

(60) days after the entry of the Final Order approving the DIP Facility, if any (the "**Challenge Deadline**"). Any and all Challenges by any party (including any Chapter 11 or Chapter 7 trustee) shall be forever barred unless brought on or before the Challenge Deadline.

16.    Nothing in this Interim Order authorizes the Debtor to accelerate any payments not otherwise due prior to the date of the Final Hearing.

17.    Nothing herein or in the Motion shall be construed as to limit, or in any way affect, the Debtor's ability to dispute or contest the amount of or basis for any claims against the Debtor.

18.    All applicable financial institutions are authorized and directed to receive, process, honor, and pay, at the Debtor's direction, to the extent of funds on deposit or otherwise available therefor, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtor in respect of any obligations contemplated within this Interim Order.

19.    The Debtor is authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of any payments made hereunder to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtor's Chapter 11 Case.

20.    Nothing contained in this Interim Order or in the Motion, and no payments made pursuant to this Interim Order are intended to be or shall be construed as (a) an admission as to the validity, priority, or perfection of any claim or lien against the Debtor or their property, (b) a waiver of any Debtor's or any appropriate party in interest's rights to avoid or dispute any claim or lien against any Debtor or its property, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to

the validity, priority, or amount of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

21.     The contents of the Motion are deemed to satisfy the requirements set forth in Bankruptcy Rules 6003 and 6004.

22.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Interim Order shall be immediately effective and enforceable upon its entry, (ii) the Debtor are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Interim Order, and (iii) the Debtor may, in their discretion and without further delay, take any action and perform any act authorized under this Interim Order.

23.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation, implementation or enforcement of this Interim Order.

### ### END OF ORDER ###

**Prepared and presented by:**

**KECK LEGAL, LLC**
*/s/ Benjamin R. Keck*
Benjamin R. Keck, Ga. Bar No. 943504
2801 Buford Highway NE, Suite 115
Atlanta, GA 30329
Tel. (470) 826-6020
bkeck@kecklegal.com
*Proposed Counsel for the Debtor*

**Distribution List**

Benjamin R. Keck
KECK LEGAL, LLC
2801 Buford Highway NE, Suite 115
Atlanta, GA 30329

Office of the United States Trustee
Attn: David Weidenbaum
Suite 362, Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

## <u>Exhibit D</u>

**[To be supplemented]**